KENNETH L. MARAMAN, SR. AND MILDRED MARAMAN, ADMINISTRATORS THE ESTATE OF KENNETH L. MARAMAN, JR., PLAINTIFFS v. COOPER STEEL FABRICATORS AND JAMES N. GRAY COMPANY, DEFENDANTS

No. COA00-396

(Filed 6 November 2001)

**1. Employer and Employee— *Woodson* claim—subcontractor**

The trial court erred by directing verdict in favor of defendant subcontractor employer under N.C.G.S. § 1A-1, Rule 50 on a *Woodson* claim concerning whether the employer intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death to decedent employee while the employee was performing steel construction work, because: (1) a supervisor of defendant subcontractor ordered removal of safety lines in an area where steel erection was completed so that the lines could be used in a forward section of the project; (2) evidence was introduced tending to show some lines had been moved near the crane but were never used in the connector area; (3) at the time of decedent's fall, the supervisor was in charge of

work and standing on the ground in view of crew members; (4) substantial evidence indicated decedent was working as a connector over thirty feet above the ground without a safety line having been installed when he was struck by a large iron joist raised by the crane, which was in violation of the employer's policy and OSHA regulations; (5) the subcontractor employer was cited for two serious violations of OSHA standards and the violations indicated a strong probability both of accident and injury or death in the event of noncompliance; (6) the subcontractor employer had the authority to control safety on the job, but had been previously caught for safety violations; and (7) evidence was introduced describing the actions of the supervisor employer and other employees following decedent's death in installing a safety line at the location of decedent's fall and in tampering with the memory of the crane involved in the incident.

2. **Employer and Employee— *Woodson* claim—general contractor—right to control method and manner of work—inherently dangerous work**

The trial court did not err by directing verdict in favor of defendant general contractor under N.C.G.S. § 1A-1, Rule 50 on a *Woodson* claim concerning whether the general contractor intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death to decedent subcontractor's employee while the employee was performing steel construction work, because: (1) defendant general contractor did not retain the right to control the method and manner in which defendant subcontractor performed its job since the general contractor maintained a supervisory role only, was not present on the job site the day of the accident, and played no role in the events leading up to this accident or the subcontractor's conduct after the accident; (2) steel construction work was not inherently dangerous work; (3) any negligence on the part of defendant subcontractor with respect to safety precautions cannot be imposed to defendant general contractor and employer; and (4) defendant general contractor took the necessary precautions to control the attendant risks, was not aware that defendant subcontractor had dropped the safety lines, and did not proximately cause the injury to decedent employee.

Judge TYSON dissenting.

Appeal by plaintiffs from orders entered 22 March 2000 by Judge James E. Lanning in Mecklenburg County Superior Court. Heard in the Court of Appeals

*Price, Smith, Hargett, Petho & Anderson, by Wm. Benjamin Smith, for plaintiff-appellants.*

*Jones, Hewson & Woolard, by Lawrence J. Goldman, for defendant-appellee Cooper Steel Fabricators.*

*Hedrick, Eatman, Gardner & Kincheloe, L.L.P., by Hatcher Kincheloe and Neil P. Andrews, for defendant-appellee James N. Gray Company.*

JOHN, Judge.

Plaintiffs Kenneth L. Maraman, Sr. (Kenneth, Sr.), and Mildred Maraman appeal the trial court's orders directing verdicts in favor of defendants Cooper Steel Fabricators (Cooper Steel) and James N. Gray Company (Gray). Plaintiffs are awarded a new trial as to Cooper Steel, but no error is found as to Gray.

Plaintiffs filed the instant action 12 December 1997 in Mecklenburg County Superior Court. Each defendant answered plaintiffs' complaint, cross claimed against the other for contribution or indemnity, and filed subsequent motions for summary judgment. The latter were denied by the trial court.

Trial commenced 25 October 1999. Plaintiffs' evidence tended to show the following: Gray served as general contractor for construction of a warehouse in Huntersville, North Carolina, and entered into a contract with Cooper Steel to perform steel fabrication and erection work at the job site. Kenneth L. Maraman, Jr. (decedent), and his father, Kenneth, Sr., were employed by Cooper Steel as steel erectors. Decedent was twenty-four years old and had worked in steel erection for approximately seven years.

On 15 December 1995, decedent and his father were working at the Huntersville warehouse job site. The building was being constructed by creation of a concrete pad and establishment of a series of columns rising upwards from ground level. Steel girders connected column to column and metal joists were assembled which connected girders to girders "cross ways," filling the space between them.

Equipment on the job included a man-lift, consisting of a bucket on a hydraulic lift with a telescoping pole. Steel erectors (workers)

MARAMAN v. COOPER STEEL FABRICATORS

[146 N.C. App. 613 (2001)]

such as decedent utilized nylon safety belts equipped with lanyards that hooked to "D-rings" on the belts and to "tie-offs" on the bucket. When required to stand on steel components of the structure, workers would tie onto a safety line or "rat line," described as

> a cable that generally runs from column to column. It is tied off on the [girder] but basically across the [girder], it should be from one end of the [girder] to the other.

Hooking the lanyard onto the safety line would enable workers to move from column to column while being tied off, and having the lanyard thus tied off to a safety line would prevent workers from falling more than six feet.

Kenneth, Sr., testified that on 15 December 1995 at about 1:00 p.m., he and a co-worker were ordered by Robert Marlowe (Marlowe), "senior man" for Cooper Steel at the site, to drop the safety lines from an area of the project where erection was complete so that the lines could be used in a forward section. Kenneth, Sr., recollected that some of the lines "got moved right up under the crane," but "were never used," and that he dropped safety lines "all the way up to two bays before I got to the connectors, which it didn't have no safety lines at that point any way."

Approximately four hours later that day, decedent was working as a "connector" at the open end of the building where erection was ongoing. According to Cooper Steel employee James Fults (Fults), a "connector's" job was to "catch" iron joists raised by the crane, "set [them] in place, and weld [them] down or bolt [them] up." Decedent went up in the man-lift some thirty-one and one-half feet above the ground to help place large joists into position. Fults described the joists as "huge," "the biggest joists I ever seen[,] 85 feet long. . . ."

Kenneth, Sr., testified that upon exiting the bucket onto a girder, decedent looked for a safety line upon which to attach his lanyard, but "there was no line there." Kenneth, Sr., further related that the ground crew raising the joist by means of a crane experienced a problem:

> So they flew it back down, and then rerigged it. And then they brought it back up. And when it started back up, it done the same thing. And then it I'm not mistaken, I heard somebody holler, bring it back down, and then somebody else hollered, no, let it fly. Just take it on up.

While standing on the girder, decedent reached out to position the joist. When he did so, the joist bounced and struck decedent in the head, knocking him to the ground. He was transported to the hospital by ambulance and pronounced dead a few hours later.

At all pertinent times during the incident, Marlowe was in charge at the site and standing on the ground in view of crew members, including decedent and Kenneth, Sr. Although no Gray representative was present on the date of decedent's fall, Gray maintained a supervisory trailer at the construction site and a Gray representative visited the site on a regular basis.

Kenneth, Sr., and Fults testified that Marlowe subsequently organized a group to return to the job site that night where, as Fults described it,

> we put up a rat line, and they got . . . Marlowe and Tadpole got in the crane and done something, and I don't know exactly what it was they done. But I had asked them, and they told me that it was something to the effect of messing with the memory of the crane, because to the effect that OSHA can pull the memory of the crane, and tell every move that crane had made.

Fults related that the rat line was installed at the location of decedent's fall using the headlights of trucks for illumination, and that "there was no rat line where Kenny was [working]" at the time of the accident."

John Francis (Francis), a North Carolina Department of Labor, Occupational Safety and Health Division investigator, conducted an on-site investigation the following day. Francis described the "hazard level" of steel erection as "rather high" and related the minimum standard fall protection in steel erection projects. He indicated that for work more than thirty feet "outside a structure," such as that in issue, the standard required one hundred per cent tie off to "an eye somewhere attached that would support [a] five thousand pound shock load."

Francis stated that information he received at the job site indicated decedent had unhooked his lanyard from a safety line so as to move around a girder and then snap it back onto the safety line. Decedent reportedly was struck by the joist "while he was unfastened from his rat line," and fell. Francis testified that

[b]ased on the information I got during the inspection, I received from the folks involved, there was no doubt in my mind there was a rat line in place

at the time of decedent's fall.

Upon completing his investigation, Francis cited Cooper Steel for "serious" violation of OSHA standards as follows:

continuous fall protection was not in use at the time of the incident, even though [Cooper Steel's] safety rules required it, and there was a foreman on-site to enforce it[,] . . . and not controlling a load with a tag line.

Questioned about evidence that a safety line may not have been installed at the location where decedent was working at the time of his fall, Francis replied:

if . . . we have the decedent standing on a length of any description without the appropriate anchor point, then we're going to be confronted with the same thing that we were even with the rat line there. . . .

[I] would [not] have changed [my] citation even if there had been no rat line at all. . . .

Francis related that certain violations classified as "wilful serious" and "wilful" went "even beyond" the "serious" violations with which Cooper Steel was charged. However, he characterized Cooper Steel's violations as "high/high," meaning that "as a result of the standard's violation particularly as it's looked at through that industry," there existed a high probability that an accident would occur and that, should it occur, "there [wa]s going to be a high severity, permanent disability, or death." Each "high/high" violation customarily carried a base penalty of $7,000, but Francis reduced each fine to $3500.00 in light of Cooper Steel's clean history and its large employee compliment of approximately one hundred employees. Francis did not cite Gray for any OSHA violations, indicating "[he] was given to understand that Gray was the general contractor."

At the close of plaintiffs' evidence, each defendant moved for directed verdict pursuant to N.C.G.S. § 1A-1, Rule 50 (1999). The trial court allowed both motions, and plaintiffs appeal.

By their sole assignment of error, plaintiffs contend the trial court committed reversible error by "granting a direct[ed] verdict to the

MARAMAN v. COOPER STEEL FABRICATORS

[146 N.C. App. 613 (2001)]

Defendants Cooper Steel and Gray Construction." It is well established that

> [a] directed verdict should be granted only if the trial judge could properly conclude that no reasonable juror could find for [the nonmoving party]. All conflicts in the evidence must be resolved in favor of [the nonmoving party,] [] the evidence must be viewed in a light most favorable to [the nonmoving party,]

*Estate of Smith v. Underwood*, 127 N.C. App. 1, 13, 487 S.E.2d 807, 815 (1997), and the nonmoving party "must be given the benefit of all reasonable inferences that may be drawn from that evidence," *Abels v. Renfro Corp.*, 335 N.C. 209, 214-15, 436 S.E.2d 822, 825 (1993) (citations omitted). To survive a directed verdict motion, the non-moving party must have presented evidence adequate to sustain a jury verdict in its favor or must have offered sufficient evidence "to present a question for the jury." *Best v. Duke University*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994) (quoting *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 323, 411 S.E.2d 133, 138 (1991)).

> A directed verdict is properly granted where it appears, as a matter of law, that the nonmoving party cannot recover upon any view of the facts which the evidence reasonably tends to establish.

*Beam v. Kerlee*, 120 N.C. App. 203, 210, 461 S.E.2d 911, 917 (1995). Bearing these principles in mind, we proceed to a consideration of plaintiffs' arguments as they relate to each defendant.

## I. Defendant Cooper Steel

[1] Turning first to plaintiffs' assignment of error challenging the entry of directed verdict in favor of decedent's employer Cooper Steel, we note that notwithstanding the exclusivity provisions of the Workers Compensation Act (the Act), *see* N.C.G.S. §§ 97-9 (employer subject to the Act is liable to employee injured in course of employment only "to the extent and in the manner" provided in the Act), and 97-10.1 (1999) (if employer and employee have complied with the Act, rights and remedies granted therein "shall exclude all other rights and remedies"), an exception was created in *Woodson v. Rowland*, 329 N.C. 330, 340-1, 407 S.E.2d 22, 28 (1991), allowing an injured employee under certain circumstances to pursue a independent civil action against his or her employer.

The elements of a *Woodson* claim are: (1) misconduct by the employer; (2) intentionally engaged in; (3) with the knowledge that the misconduct is substantially certain to cause serious injury or death to an employee; and (4) that employee is injured as a consequence of the misconduct.

*Pastava v. Naegele Outdoor Advertising*, 121 N.C. App. 656, 659, 468 S.E.2d 491, 494, *disc. review denied*, 343 N.C. 308, 471 S.E.2d 74 (1996).

In support of the trial court's action, Cooper Steel relies upon several decisions in which our appellate courts have rejected *Woodson* claims. *See, e.g., Hooper v. Pizzagalli Construction Co.*, 112 N.C. App. 400, 436 S.E.2d 145 (1993), *disc. rev. denied*, 335 N.C. 770, 442 S.E.2d 516 (1994); *Canady v. McLeod*, 116 N.C. App. 82, 446 S.E.2d 879, *disc. review denied*, 338 N.C. 308, 451 S.E.2d 632 (1994); *Powell v. S & G. Prestress Co.* 342 N.C. 182, 463 S.E.2d 79 (1995); *Echols v. Zarn, Inc.*, 342 N.C. 184, 463 S.E.2d 228 (1995); *Mickles v. Duke Power Co.*, 342 N.C. 103, 463 S.E.2d 206 (1995); *Jones v. Willamette Industries*, 120 N.C. App. 591, 463 S.E.2d 294 (1995), *disc. review denied*, 342 N.C. 656, 467 S.E.2d 714 (1996); *Kelly v. Parkdale Mills, Inc.*, 121 N.C. App. 758, 468 S.E.2d 458 (1996); *Rose v. Isenhour Brick & Tile Co., Inc.* 344 N.C. 153, 472 S.E.2d 774 (1996); and *Tinch v. Video Industrial Services, Inc.*, 129 N.C. App. 69, 497 S.E.2d 295 (1998).

However, plaintiffs counter by citing decisions in which *Woodson* claims were allowed to proceed. In *Arroyo v. Scottie's Professional Window Cleaning, Inc.*, 120 N.C. App. 154, 461 S.E.2d 13, *disc. review allowed*, 342 N.C. 190, 463 S.E.2d 231 (1995), *disc. review improvidently allowed*, 343 N.C. 118, 468 S.E.2d 58 (1996), for example, this Court reversed dismissal for failure to state a claim under N.C.G.S. § 1A-1, Rule 12 (b)(6) (1994) (Rule 12(b)(6), of an injured window washer's *Woodson* complaint against his employer. *Id.* at 159-60, 461 S.E.2d at 17. The window washer had alleged a supervisor required him to lean outward from a small ledge without fall protection equipment and refused to allow fellow employees to hold onto him, that the employer was aware safe work methods were not being practiced, and that the employer knew of the supervisor's past record of ignoring safety requirements. *Id.* We held the

allegations [we]re sufficient to state a legally cognizable claim under *Woodson* that defendant [employer] intentionally engaged

in conduct that it knew was substantially certain to cause serious injury or death.

*Id.* at 160, 461 S.E.2d at 17; *see also Regan*, 118 N.C. App. at 330-31, 454 S.E.2d at 852 (Rule 12(b)(6) dismissal of *Woodson* claim reversed where employee was injured cleaning a paint machine and had alleged prior serious injuries and deaths in operation of machine and non-operability of emergency switch on machine in conjunction with employer's knowledge of non-functioning switch and failure to advise employee of this circumstance), and *Pastava v. Naegele Outdoor Advertising*, 121 N.C. App. 656, 657, 468 S.E.2d 491, 494, *disc. review denied*, 343 N.C. 308, 471 S.E.2d 74 (1996) (Rule 12 (b)(6) dismissal of *Woodson* claim reversed where employee was injured when working on billboard which collapsed and had alleged employer's actual knowledge of billboard's unsafe and dangerous condition, its failure to perform billboard inspections or to provide workplace safety training, and its previous citations and fines for workplace safety violations).

No one factor is determinative of the viability of a *Woodson* cause of action, but rather all facts and circumstances taken together must be considered. *Mickles v. Duke Power Co.*, 115 N.C. App. 624, 628, 446 S.E.2d 369, 372 (1994), *rev'd on other grounds*, 342 N.C. 103, 463 S.E.2d 206 (1995). To uphold the trial court's directed verdict in the instant case, we must determine the evidence at trial was insufficient as a matter of law to present a question for the jury, *see Beam*, 120 N.C. App, at 210, 461 S.E.2d at 917, regarding plaintiffs' *Woodson* claim. We conclude the trial court erred.

First, it was undisputed that Marlowe, a Cooper Steel supervisor, ordered removal of safety lines in an area where steel erection was completed so that the lines could be used in a forward section of the project. Evidence was introduced tending to show some lines had been moved near the crane, but "were never used" in the connector area. At the time of decedent's fall, Marlowe was in charge of work and standing on the ground in view of crew members, including decedent and Kenneth, Sr. Further, despite Cooper Steel's policy of "a hundred percent tie off when working six feet out in the air" and OSHA regulations requiring "one hundred percent tie off" for work more that thirty feet "outside a structure," and the presence of Marlowe on site to enforce such rules, substantial evidence indicated decedent was working as a "connector" over thirty feet above the ground without a safety line having been installed when he was struck by a large

iron joist raised by the crane. Indeed, Cooper Steel was cited by Francis for two "serious" violations of OSHA standards, the absence of continuous fall protection and failing to "control[] a load with a tag line." *See Lane v. R.N. Rouse & Co.*, 135 N.C. App. 494, 498, 521 S.E.2d 137, 140 (1999) (evidence of OSHA violations "following a death" relevant to issues of "negligence and gross negligence"). Significantly, moreover, Francis characterized Cooper Steel's OSHA violations as "high/high," indicating a strong probability both of accident and injury or death in the event of noncompliance.

In addition, according to Kenneth, Sr., both Cooper Steel and Gray "had authority to control safety on the job." Yet Fults described previous safety violations by Cooper Steel at the site, acknowledging he once had been "caught" failing to tie off. Fults also stated there had been "occasions" during the Huntersville construction upon which Gray representatives stopped work until safety rules were complied with when "[a Cooper Steel employee] was not tied off", and also when Cooper Steel supervisors had "turned their back[s]" on "risk[s] with [workers'] li[ves] 30 feet up in the air."

Finally, evidence was introduced describing the actions of Marlowe and other Cooper Steel employees following decedent's death in installing a safety line at the location of decedent's fall and in tampering with the memory of the crane involved in the incident. Without citing any authority, Cooper Steel maintains that

> such evidence is irrelevant to the *Woodson* inquiry: Whether prior to the accident, there was any intentional misconduct on the part of Cooper Steel Fabricators.

We agree with Cooper Steel's general statement of the law as it applies to subsequent repairs or precautions. *See* N.C.G.S. § 8C-1, Rule 407 (1999), and *Lane v. Rouse*, 135 N.C. App. at 498, 521 S.E.2d at 140 ("when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event"). However, evidence of subsequent repairs or precautions may be offered for other purposes, such as "proving . . . feasibility of precautionary measures, . . . or impeachment." *Id.* at 498-99, 521 S.E.2d at 140.

In any event, moreover, we do not share Cooper Steel's characterization by implication of the evidence as "remedial measures." Rather, the testimony regarding the nocturnal visit to the accident

scene by Marlowe and other Cooper Steel employees was more descriptive of obstructing investigation or tampering with evidence. Indeed, Cooper Steel itself in its appellate brief uses the phrase "alleged attempt to cover up the alleged absence of a [safety] line" to describe the late night actions of Marlowe and the other workers. Particularly as bearing upon the factors of intent and knowledge, *see Nadeau v. Employment Security Commission*, 97 N.C. App. 272, 276, 388 S.E.2d 145, 147 (1990) (repeated personal telephone calls on company time and company expense constituted "misconduct" justifying discharge of employee for good cause, and evidence of subsequent discovery of employee's tampering with company phone system to subvert prohibition against long distance calls "relevant to show [employee's] state of mind concerning use of employer's phone system"), and *State v. Goldston*, 343 N.C. 501, 504, 471 S.E.2d 412, 414 (1996) (that criminal defendant "went to considerable lengths to concoct a story that would explain his wound . . . [evidence of] guilty knowledge"); *see also Pratt v. Bishop*, 257 N.C. 486, 506, 126 S.E.2d 597, 611 (1962) (quoting Wigmore on Evidence, 3rd Ed., § 278) (in civil case, " 'a party's fabrication or suppression of evidence . . ., and *all similar conduct*, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit' "), *State v. Trull*, 349 N.C. 428, 448, 509 S.E.2d 179, 192 (1998) (criminal defendant's "attempts to cover up involvement" in crime among "circumstances from which pre-meditation and deliberation can be inferred"), and *Red Mill Hosiery Mill, Inc. v. Magnetek, Inc.*, 138 N.C. App. 70, 78, 530 S.E.2d 321, 328 (2000) ("party's intentional destruction of evidence in its control before it is made available to the adverse party can give rise to an inference that the evidence destroyed would injure its (the party who destroyed the evidence) case"), the inferences raised by the cover up and tampering evidence constituted factors to be considered by the trial court with all others, *see Mickles*, 115 N.C. App. at 628, 446 S.E.2d at 372, in ruling upon Cooper Steel's directed verdict motion.

In sum, we view plaintiff's evidence as adequate to have raised a jury question, *see Best*, 337 N.C. at 749, 448 S.E.2d at 510, as to whether Cooper Steel "intentionally engage[d] in misconduct knowing it [was] substantially certain to cause serious injury or death to [decedent]," *Woodson*, 329 N.C. at 340, 407 S.E.2d at 228, and hold that the trial court erred in directing a verdict against plaintiffs on that issue.

## II. Defendant Gray

[*N.B. In light of Judge Greene's concurrence with Judge Tyson's opinion regarding defendant Gray, the following discussion must be read as a dissent and Judge Tyson's opinion as the majority opinion regarding defendant Gray with Judge Greene concurring.*]

Plaintiffs next maintain the evidence adduced at trial was sufficient to raise a jury issue regarding their claim against Gray as general contractor.

Preliminarily, it may be noted that decedent's status as an employee of the subcontractor Cooper Steel and not of the general contractor Gray was uncontroverted. Therefore, the exclusive remedy provisions of the Act, *see* G.S. §§ 97-9 and 97-10.1, were not implicated regarding plaintiffs' claim against Gray.

Ordinarily, "a general contractor is not liable for injuries sustained by a subcontractor's employees." *Hooper v. Pizzagalli*, 112 N.C. App. at 403, 436 S.E.2d at 148. However, plaintiffs rely upon two recognized exceptions to the general rule of no liability. The first involves those "situations where the contractor retains control over the manner and method of the subcontractor's substantive work." *Id.* at 404, 436 S.E.2d at 148 (citation omitted). The second concerns circumstances wherein

the independent contractor is hired to perform an inherently dangerous activity, and the general contractor 'knows or should know of the circumstances creating the danger.'

*Dunleavy v. Yates Construction Co.*, 114 N.C. App. 196, 202, 442 S.E.2d 53, 56 (1994) (quoting *Dunleavy v. Yates Construction Co.*, 106 N.C. App. 146, 153, 416 S.E.2d 193, 197, *disc. review denied*, 332 N.C. 343, 421 S.E.2d 146 (1992)). Accordingly, if an independent subcontractor is negligent thereby causing injury to its employee and at least one of the foregoing exceptions is present, then the general contractor may not "escape liability by merely relying on the legal ground that [the subcontractor] was an independent contractor." *Woodson*, 329 N.C. 330, 357, 407 S.E.2d 222, 238 (1991).

Plaintiffs first argue Gray maintained control over the manner and method of Cooper Steel's work. Thorough examination of the record reveals the evidence adduced at trial was adequate to present a jury question as to this issue. *See Best*, 337 N.C. at 749, 448 S.E.2d at 510.

First, Gray's construction contract with the owner of the Huntersville tract included the following provisions:

6.1 [Gray] shall be responsible for initiating, maintaining and providing supervision of safety precautions and programs in connection with the [Huntersville project].

6.2 [Gray] shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (1) employees on the [project] and other persons who may be affected thereby;. . . .

6.3 [Gray] shall give notices and comply with applicable laws, ordinances, rules, regulations and orders of public authorities bearing on the safety of persons and property and their protection from damages, injury or loss.

Next, the contract between Gray and Cooper Steel provided as follows:

2.1 SUBCONTRACTOR'S WORK. Gray contracts with the Subcontractor as a independent contractor to perform the work described in the Scope of Work . . . under the general direction of Gray and in strict accordance with the Agreement and the Subcontract Documents. . . . . .

8.11.1 The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons and property, and in accordance with requirements of the Subcontract Documents. . . .

8.11.2 Subcontractor shall comply with Gray's Safety Requirements.

In addition, plaintiffs point to evidence that

Gray maintained a supervisory trailer on the job site within sight of where the steel erection was occurring and that a Gray employee was sometimes in the area,

and to testimony that Gray and Cooper Steel were "equally responsible for job safety." Moreover, Gray required "a safety session" before allowing subcontractor employees on the job site, which session included "orientation into the fact that you need[ed] to be

one hundred percent attached when you're up in the air above six feet. . . ."

Finally, Kenneth, Sr., testified as follows:

Q. Did you ever see an occasion where someone from James N. Gray saw someone not tied off, and said don't worry about it?

A. I've seen occasions that people worked for Gray walked up and said make that man tie off.

Q. So if they saw—if they saw someone violating one of their safety rules, they would make that person . . . get back into compliance?

A. Yes.

Q. Before they let them go on working?

A. Yes.

The foregoing evidence, giving plaintiffs "the benefit of all reasonable inferences that may be drawn," *Abels*, 335 N.C. at 214-15, 436 S.E.2d at 825, therefrom, was sufficient for submission to the jury of the first exception issue, that is, whether Gray "retained the right to control the method and manner in which [Cooper Steel] and its employees performed their job." *Hooper*, 112 N.C. App. at 404, 436 S.E.2d at 148. As opposed to the exercise of "a general supervisory role," *id.* at 405, 436 S.E.2d at 149, evidence was introduced tending to show Gray "interfer[ed] with [Cooper Steel's work] or [some] part of its work so as to retain control and thereby make itself liable," *id.*

The second exception was described in *Woodson* as follows:

one who employs an independent contractor to perform an inherently dangerous activity may not delegate to the independent contractor the duty to provide for the safety of others.

*Woodson*, 329 N.C. at 352, 407 S.E.2d at 235. The Court therein explained:

Imposition of this nondelegable duty of safety reflects 'the policy judgment that certain obligations are of such importance that employers should not be able to escape liability merely by hiring others to perform them.' By holding both an employer and its independent contractor responsible for injuries that may result from inherently dangerous activities, there is a greater likelihood

that the safety precautions necessary to substantially eliminate the danger will be followed.

*Id.*

In defining "inherently dangerous," our Supreme Court observed that "[i]t is not essential . . . that the work should involve a major hazard." *Id.* at 351, 407 S.E.2d at 235. Rather,

[i]t is sufficient if there is a recognizable and substantial danger inherent in the work, as distinguished from a danger collaterally created by the independent negligence of the contractor, which latter might take place on a job itself involving no inherent danger.

*Id.* In addition, "inherently dangerous activities are susceptible to effective risk control though the use of adequate safety precautions." *Id.* at 351, 407 S.E.2d at 234.

The principle that

where reasonable minds could differ as to whether an activity is inherently dangerous, the determination is a question of fact to be determined by the fact-finder,

*McMillan v. U.S.*, 112 F.3d 1040, 1044 (9th Cir. 1997) (citation omitted), has essentially been adopted in decisions of both our Supreme Court, *see Woodson*, 329 N.C. at 353, 407 S.E.2d at 236 (although "some activities are always inherently dangerous while other may never be, . . . we do not believe every act can be defined as inherently dangerous or not, regardless of the attendant circumstances") and this Court, *see Lilley v. Blue Ridge Electric Membership Corporation*, 133 N.C. App. 256, 260, 515 S.E.2d 483, 486-7) (1999) (between "spectrum of activities, some of which are never inherently dangerous, as a matter of law, and some of which are always dangerous, as a matter of law," are sets of "circumstances [which] fall squarely at [n]either end of the spectrum," and determination of whether the latter constitute an inherently dangerous activity is for the jury).

To sustain the trial court's directed verdict on this issue, we must determine that the evidence presented at trial failed as a matter of law to raise a jury question as to whether the activity at issue was inherently dangerous. *See Beam,*, 120 N.C. App. at 210, 461 S.E.2d at 917. In making such determination, the focus is not upon the work activity in a generalized sense, but rather upon the specific work

being done at the time at issue under the particular "attendant circumstances," *id.* at 260, 515 S.E.2d at 487 (citation omitted), then existing, *see Woodson*, 329 N.C. at 356, 407 S.E.2d at 237 (citation omitted) ("the focus is not on some abstract activity called 'trenching' "; rather, "the focus is on the particular trench being dug and the pertinent circumstances surrounding the digging").

In the case *sub judice*, the specific work engaged in by decedent involved attempting to stabilize, and then weld to a girder, an unusually large, eighty-five foot length of steel joist being hoisted by a crane while decedent was standing upon a narrow girder thirty-one and one-half feet above the ground. Although, as Gray points out, construction of a building generally has been held by our Supreme Court not to be

> of that character which the policy of the laws requires that the owner shall not be permitted to free himself from liability by contract with another for its execution,

*Vogh v. F.C. Geer Co.*, 171 N.C. 672, 676, 88 S.E. 874, 876 (1916), the foregoing specific "attendant circumstances," *Lilley*, 133 N.C. App. at 260, 515 S.E.2d at 487, appear

> at a minimum, [to] present[] a factual question of whether 'there is a recognizable and substantial danger inherent in the work,'

*id.* at 261, 515 S.E.2d at 487 (quoting *Woodson*, 329 N.C. at 351, 407 S.E.2d at 235), being performed by decedent, *see also Lane v. Rouse*, 135 N.C. App. at 497, 521 S.E.2d at 139 (concrete finishing during which worker was required "to walk backwards while paying close attention to the work in front of him" presented issue for jury as to whether work was inherently dangerous).

Without belaboring the point, moreover, other indications of the inherent danger of decedent's work activity included Francis' description of the "hazard level" of steel erection work as "rather high," his notation of violations of OSHA fall protection regulations at the time of decedent's fall, *see Woodson*, 329 N.C. at 351, 407 S.E.2d at 234 ("inherently dangerous activities are susceptible to effective risk control through the use of adequate safety procedures"), and also his characterization of those violations as "high/high," that is, a high probability of accident coupled with an additional high probability that serious injury or death would result in the event of such accident.

There remains the question of Gray's "knowledge of the circumstances creating the danger," *Dunleavy*, 114 N.C. App. at 202, 442 S.E.2d at 56. If

the activity is inherently dangerous *and* the [party who hired the independent contractor] knows or should know of the circumstances creating the danger, then [it] has [a] nondelegable duty to the independent contractor's employees. . . .

*Cook v. Morrison*, 105 N.C. App. 509, 515-16, 413 S.E.2d 922, 926 (1992) (emphasis added).

In advancing the contention that it lacked either actual or constructive knowledge of "the circumstances creating the danger," *id.*, Gray highlights the uncontradicted evidence it had no representative at the site either when Marlowe ordered dismantling of the safety lines or when decedent later went up in the man-lift to assist in placement of a large joist. Gray's reasoning is misdirected.

In *Lilley*, this Court delineated a distinction between a general contractor's actual or constructive knowledge of the inherently dangerous work at issue as opposed to the allegedly negligent performance of that work by the subcontractor:

[the general contractor] focuses upon its knowledge of use of the rock bar, as opposed to its knowledge of setting poles on steep terrain . . . .

[The general contractor] planned the project and designed its power line to run over the steep and difficult terrain [at issue]. Given its knowledge of the topography, [the general contractor] is chargeable . . . with an awareness based upon experience and common sense that the ability of workers installing utility poles to stand and use their regular equipment [on that terrain] would, at a minimum, be significantly challenged.

*Lilley*, 133 N.C. App. at 263, 515 N.C. at 488.

Imposition of the prerequisite, to rephrase Gray's argument, that a general contractor possess actual or constructive knowledge of the specific negligence of the subcontractor at issue rather than of the inherently dangerous work would eviscerate the public policy behind creation of the second exception, that is, preventing employers from escaping liability by hiring others to perform the work for them and increasing the "likelihood that the safety precautions necessary to substantially eliminate the danger will be followed." *Woodson*, 329

N.C. at 352-53, 407 S.E.2d at 234-35 (citations omitted). Further, it is not negligence which creates the "recognizable and substantial danger inherent in the work," *id.* at 351, 407 S.E.2d at 235 (citation omitted) (emphasis omitted); instead, negligence is the alleged cause of injury, *see id.* at 352, 407 S.E.2d at 235 (citation omitted) (" '[t]here is an obvious difference between committing work to a contractor to be executed, from which if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless preventive measures are adopted' ").

The nondelegable duty engendered under the second exception, therefore, rests upon the general contractor's actual or constructive knowledge of the inherently dangerous work. *See Lilley* at 263, 515 S.E.2d at 488. In the instant case, suffice it to state that evidence of Gray's awareness of "the recognizable and substantial danger inherent in the work," *Woodson*, 329 N.C. at 351, 407 S.E.2d at 235, performed by decedent was plenary, *see Lane v. Rouse*, 135 N.C. App. at 497, 521 S.E.2d at 139 (record reflected that general contractor was "aware of the floor openings and of the need to cover them for the safety of workers").

In sum, plaintiffs having presented evidence sufficient "to present a question for the jury," *Best*, 337 N.C. at 749, 448 S.E.2d at 510, as to: 1) the issue of the latter's retention of control over the method and manner in which Cooper Steel performed its work at the Huntersville construction site, and 2) the issue of whether decedent's work constituted an inherently dangerous activity and whether Gray "had knowledge of the circumstances creating the danger," *Lilley*, 133 N.C. App. at 263, 515 S.E.2d at 488, the trial court erred in directing a verdict in favor of defendant Gray on those issues. Nothing else appearing, should the jury at retrial return verdicts favorable to plaintiffs on either of these issues or both *and* upon the issue of the negligence of Cooper Steel proximately causing injury to decedent, such verdicts would support a judgment against Gray in consequence of the latter's nondelegable and "continuing responsibility to see that adequate safety precautions [we]re taken." *Woodson*, 329 N.C. at 352, 407 S.E.2d at 235.

Notwithstanding, Gray insists *Woodson* indicates that Gray's liability, if any, for the negligence of Cooper Steel "is direct and not derivative," *id.*, and that short of "assigning a permanent supervisor to observe every action of each employee, [] Gray did all it could to enforce safety." Although examination of the sources relied upon by

our Supreme Court in making the statement in *Woodson* relied upon by Gray indicates the latter has misinterpreted the purport of that statement, such confusion is understandable in light of recent decisions of this Court which likewise have cited the identical portion of *Woodson*.

As the source of the phraseology relied upon by Gray, the *Woodson* Court quoted its earlier decision in *Dockery v. Shows*, 264 N.C. 406, 410, 142 S.E.2d 29, 32 (1965). *Dockery* in turn cited identical language in *Evans v. Rockingham Homes*, 220 N.C. 253, 259, 17 S.E.2d 125, 129 (1941). That case dealt with a circumstance wherein the plaintiff elected to take a voluntary dismissal as to her claim against the independent subcontractor, but continued to pursue her action against the general contractor. *Id.* at 261, 17 S.E.2d at 132. The Court stated that although the independent contractor might also be liable based upon the "want of due care in not taking the necessary precautions, for the omission of which the [general contractor] becomes liable," *id.*, the liability of the general contractor was "not imputed, but [rather] original and independent as a violation of duty which the policy of the law makes nondelegable." *Id.* Hence the general contractor was directly" responsible to the plaintiff and "the voluntary [dismissal] taken as to the [subcontractor] left the cause of action as to the [general contractor] unaffected." *Id.* Significantly, the Court also noted the trial court erred in instructing the jury on the theories of the relation of master and servant, *respondeat superior* and agency, *id.*, traditional examples of "derivative" liability wherein failure of a claim against an employee or agent would extinguish any claim against the principal.

In *Evans*, therefore, the Court simply held that while the general contractor was liable based upon the independent subcontractor's negligent "omission," *id.*, in failing to "tak[e] the necessary precautions," *id.*, the plaintiff might nonetheless proceed "directly" against the general contractor without pursuing her action against the subcontractor, *id.* Indeed, notwithstanding the argument discussed herein, Gray implicitly acknowledged this principle by including cross-claims against Cooper Steel for contribution and indemnity in its answer to plaintiff's complaint.

Regarding Gray's assertion it had "done all it could," an observation of our Supreme Court that

"the cases of 'non-delegable duty' . . . hold the [contractor] liable for the negligence of the [subcontractor] although [the

contractor] has [it]self done everything that could reasonably be required of [it],"

*Hendricks v. Fay, Inc.*, 273 N.C. 59, 62, 159 S.E.2d 362, 366 (1968) (quoting Prossser on Torts, 3rd Ed., § 70, 480), controls, *see Cannon v. Miller*, 313 N.C. 324, 327 S.E.2d 888 (1985) (N.C. Court of Appeals has responsibility to follow decisions of North Carolina Supreme Court "until otherwise ordered" by that Court).

Notwithstanding, in *O'Carroll v. Texasgulf, Inc.*, 132 N.C. App. 307, 511 S.E.2d 313 (1999), this Court, citing only the above language from *Woodson*, and in *Kinsey v. Mann*, 139 N.C. App. 370, 533 S.E.2d 487 (2000), citing *Woodson* and *O'Carroll*, delineated the elements of "an inherently dangerous activity claim," *Kinsey*, 139 N.C. App. at 375, 533 S.E.2d at 492, as follows:

[f]irst, the activity must be inherently dangerous. Second, at the time of the injury, the employer knew or should have know that the activity was inherently dangerous. Third, the employer failed to take the necessary precautions to control the attendant risks. And, fourth, this failure by the employer proximately caused injury to plaintiff.

*Id.*

In contrast with *Dockery, Evans* and *Hendricks*, therefore, *O'Carroll* and *Kinsey* placed the focus upon the acts or omissions of the general contractor as opposed to those of the independent contractor. Because the latter decisions rely upon *Woodson*, a decision in which the Supreme Court itself in turn relied upon its earlier opinions in *Dockery* and *Evans*, and because neither of these decisions nor *Hendricks* have been overruled by our Supreme Court, we must follow *Dockery, Evans* and *Hendricks* even though opinions of this Court may conflict therewith. *See Cannon v. Miller*, 313 N.C. at 324, 327 S.E.2d at 888, and *Dunn v. Pate*, 334 N.C. 115, 118, 431 S.E.2d 178, 180 (1993) (Court of Appeals is "responsib[le] to follow" decisions of the North Carolina Supreme Court).

To capsulize, therefore, in plaintiffs' action against Gray for breach of its "nondelegable duty" occasioned either by Gray's retention of control over Cooper Steel's performance of its work or by decedent's work constituting an inherently dangerous activity, or both, there is no requirement, to paraphrase Gray's argument, that there be proof of an additional element that the general contractor Gray failed to "do all it could," *see Hendricks* at *id.*, 159 S.E.2d at 366,

or that Gray "failed to take the necessary precautions to control the attendant risks," *Kinsey*, 139 N.C. App. at 375, 533 S.E.2d at 492.

Finally, Gray maintains the trial court's directed verdict in its favor was proper in light of the lack of evidence as to Cooper Steel's alleged negligence as well as of the conclusive nature of the evidence of decedent's contributory negligence. However, the record reflects that the trial court in ruling upon Gray's directed verdict motion made no mention of these issues, stating simply that the evidence presented contained "nothing which would indicate that [] Gray had any kind of notice that anything at all was wrong." Indeed, the primary thrust of Gray's oral argument to the trial court focused upon its contentions regarding the matters discussed above, *i.e.*, whether decedent's work constituted an inherently dangerous activity, whether Gray had "done all it could," etc. Save for generalized assertions that decedent "was aware of the circumstances" and "aware of the danger," moreover, contributory negligence was not orally cited by Gray to the trial court as a grounds for its motion. *See Merrick v. Peterson*, 143 N.C. App. 656, 662, 548 S.E.2d 171, 175 (2001) (requirement of N.C.G.S. § 1A-1, Rule 50(a) (1999) "that specific grounds for a motion for directed verdict be stated is to give the trial court and the adverse party notice of the grounds for the motion"); *see also* G.S. § 1A-1, Rule 50(a) ("motion for directed verdict *shall* state the *specific* grounds therefor" and "grounds not asserted in the trial court may not be asserted on appeal" (emphasis added)). Further, Gray filed no written motion specifying its grounds.

In any event, assuming *arguendo* preservation of the questions of Cooper Steel's negligence and decedent's contributory negligence for appellate review, *see Merrick*, 143 N.C. App. at 662, 548 S.E.2d at 175 (in reviewing trial court's grant of directed verdict, appellate court "may consider all of the grounds specifically stated by the moving party in its motion to the trial court"; Rule 50(a) "does not allow a moving party to make an argument in support of the directed verdict for the first time on appeal"), *Brooks v. Wal-Mart Stores, Inc.*, 139 N.C. App. 637, 650, 535 S.E.2d 55, 65 (2000) (denial of directed verdict not preserved for appellate review when movant failed to assert in trial court grounds raised on appeal), and N.C.R. App. 10(b) ("to preserve a question for appellate review, a party must have presented to the trial court a timely . . . motion, stating the specific grounds for the ruling the party desired the court to make"), upholding the trial court's directed verdict under Gray's final argument would in any event require holding the record evidence inadequate as a matter of

law to raise a jury question as to the negligence of Cooper Steel, *see Beam*, 120 N.C. at App. 210, 461 S.E.2d at 917, or, alternatively, that the evidence established decedent's contributory negligence as a matter of law. Succinctly stated, careful review of the record dictates that neither course would be appropriate. *See Benton v. Hillcrest Foods., Inc.*, 136 N.C. App. 42, 48, 524 S.E.2d 53, 58 (1999) (citation omitted) ("[g]enerally, the issue of negligence as a basis for recovery or, in the alternative, contributory negligence as a bar to recovery, is for the jury"), and *Wolfe v. Wilmington Shipyard, Inc.*, 135 N.C. App. 661, 667, 522 S.E.2d 306, 311 (1999) (quoting *Dunbar v. City of Lumberton*, 105 N.C. App. 701. 703, 414 S.E.2d 387, 388 (1992) ("a plaintiff is contributorily negligent as a matter of law, thereby entitling a defendant to a directed verdict, when 'the evidence taken in the light most favorable to [the] plaintiff established [the latter's] negligence so clearly that no other reasonable inferences or conclusions may be drawn therefrom' ").

New trial as to defendant Cooper Steel [Judge Greene concurring in Part I of Judge John's opinion], Judge Tyson dissenting; no error as to defendant Gray [Judge Greene concurring in Judge Tyson's opinion dealing with part II of Judge John's opinion regarding defendant Gray], Judge John dissenting.

TYSON, Judge, dissenting.

I respectfully dissent from the majority's opinion and would affirm the trial court's orders granting a directed verdict for defendants Cooper Steel and Gray. The evidence presented by plaintiffs at trial, allowing all inferences of fact in favor of the plaintiffs, was clearly insufficient to support a *Woodson* claim as to both defendants Cooper Steel and Gray.

## I. Defendant Cooper Steel

The Workers' Compensation Act generally provides the exclusive remedy for employees injured in a workplace accident. N.C. Gen. Stat. § 97-9, 97-10.1 (1999). However, in *Woodson*, our Supreme Court created a narrow exception to the general rule when it held that if an "employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct," an employee may maintain a tort action against the employer. *Woodson v. Rowland*, 329 N.C. 330, 340-41, 407 S.E.2d 222, 228 (1991). Substantial certainty is

more than a possibility or substantial probability of serious injury or death but is less than actual certainty. *Pastva v. Naegele Outdoor Advertising*, 121 N.C. App. 656, 658-59, 468 S.E.2d 491, 493 (1996).

The elements of a *Woodson* claim are: (1) employer misconduct; (2) intentionally engaged in; (3) knowledge that the conduct is substantially certain to cause serious injury or death to an employee; and (4) that employee is injured due to the misconduct. *Id.* at 659, 468 S.E.2d at 494. Plaintiffs fail to show that defendant Cooper Steel intentionally engaged in misconduct, knowing that its misconduct was substantially certain to cause death or serious injury and was so egregious as tantamount to an intentional tort.

The record establishes that defendant Cooper Steel maintained a safety policy requiring 100% tie-off when employees were working at heights over six feet, exceeding the OSHA requirement of tie-off at heights of twenty-five to thirty feet. Marlowe ordered the safety lines moved from the back bays where construction was complete to the front bays where construction was continuing. Defendant Cooper Steel furnished a safety manual, safety orientation, safety seminars, and held a safety "tool box" meeting at least once a week.

Plaintiffs' decedent had worked in steel erection for approximately seven years. Decedent was aware of the "tie-off" requirement and could have tied-off to the steel girder he was standing on. Though not tied-off, decedent knowingly continued to work.

The record shows no evidence that defendant Cooper Steel had prior OSHA violations or prior similar accidents. Mr. Francis, the OSHA investigator, stated that defendant Cooper Steel had a good commitment to safety. Defendant Cooper Steel was cited for two serious OSHA violations after the accident, which were reduced by OSHA. Mr. Francis testified that OSHA has both a "willful serious" and a "serious" violation, neither of which was found in this case.

*Woodson* is a narrow exception based on extreme facts. *Dunleavy v. Yates Constr. Co.*, 114 N.C. App. 196, 201, 442 S.E.2d 53, 55 (1994). The fact which clearly distinguishes this case from *Woodson*, and those cases finding a *Woodson* claim, is that defendant Cooper Steel did not instruct plaintiffs' decedent to work without being attached to a safety line. *See Woodson*, 329 N.C. 330, 407 S.E.2d 222 (employee killed when a trench collapsed, employer had four previous OSHA violations, knew the trench would fail, and knowingly refused to

allow worker to use a trench box); *Arroyo v. Scottie's Prof. Window Cleaning*, 120 N.C. App. 154, 461 S.E.2d 13 (1995) (employee injured while washing windows, employer had been previously cited for OSHA violations, provided no safety training, ordered employee to lean outward from a small ledge without fall protection equipment, and refused to allow a fellow employee to anchor); *Pastva*, 121 N.C. App. 656, 468 S.E.2d 491 (employee was injured when a billboard collapsed, employer had been cited and fined for numerous safety violations, did not provide safety training, and employer knowingly ordered employee to work on the billboard); *Cf. Regan v. Amerimark Building Products, Inc.*, 127 N.C. App. 225, 489 S.E.2d 421 (1997) (employer was aware paint machine was unguarded, that emergency switch was not working and did not advise employee, held not sufficient to prove that employer knew its action requiring employee to operate the machine was substantially certain to cause serious injury); *Pendergrass v. Card Care, Inc.*, 333 N.C. 233, 424 S.E.2d 391 (1993) (employee injured when employer instructed him to work at a machine knowing that dangerous parts were unguarded, held insufficient to establish a *Woodson* claim).

The majority's opinion refers to the installation of a safety line and tampering with the memory of the crane, by defendant Cooper Steel's employees the night after the accident, as indicative of intent and knowledge on the part of defendant Cooper Steel. These facts do not show an intent, by defendant Cooper Steel, to engage in misconduct, prior to the accident, with knowledge that the misconduct was substantially certain to cause serious injury or death to an employee. Mr. Francis testified that even if there had been no safety line present when he investigated the job site, he would not have changed the citation given to defendant Cooper Steel.

The evidence clearly does not support the inference that defendant Cooper Steel intended to injure plaintiffs' decedent or was manifestly indifferent to the consequences of its actions. I would affirm the trial court's granting of a directed verdict in favor of defendant Cooper Steel.

## II. Defendant Gray

[2] North Carolina has long recognized that a general contractor is not liable for injuries sustained by a subcontractor's employee. *Woodson*, 329 N.C. at 350, 407 S.E.2d at 234. A general contractor does not have a duty to furnish a subcontractor or the subcontractor's employees with a safe place to work. *Hooper v. Pizzagalli Constr.*

*Co.,* 112 N.C. App. 400, 403-4, 436 S.E.2d 145, 148 (1993) (citing *Brown v. Texas Co.,* 237 N.C. 738, 76 S.E.2d 45 (1953)). North Carolina does recognize a few exceptions to the general rule of no liability: (1) situations where the contractor retains control over the manner and method of the subcontractor's substantive work, (2) situations where the work is deemed to be inherently dangerous, and (3) situations involving negligent hiring and/or retention of the subcontractor by the general contractor. *Id.* at 404, 436 S.E.2d at 148 (citing *Woodson v. Rowland,* 329 N.C. 330, 407 S.E.2d 222 (1991)). Plaintiffs argue that this case falls within the first and second exceptions.

### A. Sufficient control over the subcontractor's work

The record conclusively establishes that defendant Gray did not retain the right to control the method and manner in which the subcontractor, defendant Cooper Steel, performed its job. The contract between Gray and Cooper Steel provided: (1) that Gray contracted with Cooper Steel as an independent contractor to perform steel fabrication and erection work under the general direction of Gray, and (2) that Cooper Steel shall take reasonable safety precautions and comply with safety measures or requirements initiated by Gray. Judge John's opinion states that Gray maintained a supervisory trailer on the job site, that a Gray employee was "sometimes" in the area, and that Gray required "a safety session" before the subcontractor's employees were allowed on the job site. Judge John would hold that this evidence tended to show that defendant Gray "interfered with Cooper Steel's work or some part of its work." To the contrary, the uncontroverted facts indicate that defendant Gray maintained a supervisory role only, was not present on the job site the day of the accident, and played no role in the events leading up to this accident, or Cooper Steel's conduct after the accident.

As this Court stated in *Hooper,* this evidence shows only that Gray had a general supervisory role, and does not support the proposition that Gray interfered with or retained control over the work performed by Cooper Steel and its employees. *See Hooper,* 112 N.C. App. at 404-05, 436 S.E.2d at 148-49 (while general contractor maintained a supervisory role, the subcontractor was expected to comply with the plans and was free to perform its job according to its own independent skill, knowledge, training, and experience); *Denny v. City of Burlington,* 155 N.C. 33, 70 S.E. 1085 (1911) (merely taking steps to see that the contractor carries out his agreement does not make the employer liable); *Rivenbark v. Atlantic States Constr. Co.,* 14 N.C.

App. 609, 188 S.E.2d 747 (1972) (if the negligence which caused the injury was that of the injured person's own employer and his employer was an independent contractor, the general contractor is not liable unless he participated in the negligent act).

The evidence shows that defendant Gray did not retain any right to control the method and manner in which defendant Cooper Steel performed the work. A directed verdict in favor of defendant Gray was proper as to the first exception.

### B. Inherently dangerous work

Judge John states in his opinion that erection of eighty-five foot steel joists at thirty-one feet above the ground is an inherently dangerous activity. An inherently dangerous activity has been defined as "work to be done from which mischievous consequences will arise unless preventative measures are adopted." *Greer v. Callahan Constr. Co.*, 190 N.C. 632, 637, 130 S.E. 739, 743 (1925). Our Supreme Court more recently described an inherently dangerous activity as that which has "a recognizable and substantial danger inherent in the work, as distinguished from a danger collaterally created by the independent negligence of the contractor, which latter might take place on a job itself involving no inherent danger." *Woodson*, 329 N.C. at 351, 407 S.E.2d at 235. When an activity is inherently dangerous, there is a non-delegable duty on the party that employs the independent contractor to ensure that adequate safety precautions are taken. *Lane v. R.N. Rouse & Co.*, 135 N.C. App. 494, 497, 521 S.E.2d 137, 139 (1999) (citing *Woodson v. Rowland*, 329 N.C. 330, 351-53, 407 S.E.2d 222, 234-35 (1991)), *disc. review denied*, 351 N.C. 357, 542 S.E.2d 212 (2000).

In a case factually analogous, our Supreme Court found that steel and iron work, conducted on the fourth floor of a building and using planks across girders for footing, was not "intrinsically dangerous" work. *Vogh v. F. C. Greer Co.*, 171 N.C. 672, 748, 88 S.E. 874, 876 (1916). In *Woodson*, our Supreme Court stated that whether an activity is inherently dangerous is determined by the pertinent circumstances surrounding the activity. *Woodson*, 329 N.C. at 356, 407 S.E.2d at 237. The Court further stated that certain activities that result in injury are not inherently dangerous, including generally, building construction. *Id.* at 353, 407 S.E.2d at 236 (citing *Vogh v. F.C. Greer Co.*, 171 N.C. 672, 88 S.E. 874 (1916)). Similarly, this Court has held that plumbing work, conducted on the seventh floor of a building and using scaffolding thirteen feet off of the ground, was

not an "inherently dangerous" activity. *Hooper*, 112 N.C. App. at 405-06, 436 S.E.2d at 149.

The facts in the case at bar cannot be distinguished from *Vogh* and *Hooper*. The steel construction work here was not inherently dangerous work. If steel erection was presumed to be an inherently dangerous activity, plaintiffs must still satisfy four elements in order to substantiate an inherently dangerous activity claim: (1) the activity must be inherently dangerous; (2) at the time of the injury, defendant Gray must either know or should have known that the activity was inherently dangerous; (3) defendant Gray failed to take the necessary precautions to control the attendant risks; and (4) the failure by defendant Gray proximately caused the injury to plaintiffs. *O'Carroll v. Texasgulf, Inc.*, 132 N.C. App. 307, 312, 511 S.E.2d 313, 317-18 (1999), *disc. review denied*, 350 N.C. 834, 538 S.E.2d 198 (2000). Plaintiffs cannot satisfy any of these requirements.

The record clearly establishes that defendant Cooper Steel was required to take reasonable safety precautions, to comply with safety measures initiated by Gray, and to comply with occupational safety laws. Defendant Gray also required that all of the subcontractor's employees submit to a safety session before entering the job site. Defendant Gray enforced the tie-off requirement on those occasions where it identified violations of this requirement, conducted regular safety meetings, and counseled workers on the use of safety measures.

The record further establishes that Robert Marlowe, "senior man" for defendant Cooper Steel, ordered the safety lines dropped and moved on the day of the accident. Plaintiffs' decedent had worked in steel erection for approximately seven years. Decedent was aware of the "tie-off" requirement and could have tied-off to the steel girder where he was standing. Though not tied-off, decedent knowingly continued to work by reaching out to position the joist without being attached to a safety line or the girder.

Judge John relies on earlier decisions for the proposition that any negligence by the independent contractor shall be imputed to the employer, general contractor. *See Hendricks v. Leslie Fay, Inc.*, 273 N.C. 59, 63, 159 S.E.2d 362, 366 (1968) ("But the cases of 'non-delegable duty'. . . hold the employer liable for the negligence of the contractor, although he has himself done everything that could reasonably be required of him."); *see also Deitz v. Jackson*, 57 N.C. App. 275, 279, 291 S.E.2d 282, 285 (1982) ("This rule imposes liability on an

MARAMAN v. COOPER STEEL FABRICATORS

[146 N.C. App. 613 (2001)]

employer for the negligent torts of independent contractors performing, for the employer, an activity which would result in harmful consequences unless proper precautions are taken. . . ."), *abrogated by*, *Kinsey v. Spann*, 139 N.C. App. 370, 533 S.E.2d 487 (2000). These cases suggest the employer's liability is vicarious in nature. *Hendricks*, 273 N.C. at 62, 159 S.E.2d at 366.

This Court recently addressed the issue of negligence claims based upon inherently dangerous activities. We held that it is the negligence of the employer, not the independent contractor, that must be considered; liability is direct, not vicarious, in nature. *Kinsey v. Spann*, 139 N.C. App. 370, 375, 533 S.E.2d 487, 491 (2000) (citing *Woodson v. Rowland*, 329 N.C. 330, 352, 407 S.E.2d 222, 235 (1991) ("The party that employs an independent contractor has a continuing responsibility to ensure that adequate safety precautions are taken. . . . The employer's liability for breach of this duty 'is direct and not derivative. . . .' ")); *see also Lane*, 135 N.C. App. at 497, 521 S.E.2d at 139; *O'Carroll*, 132 N.C. App. at 312, 511 S.E.2d at 317-18; *Dunleavy*, 106 N.C. App. at 153, 416 S.E.2d at 197. "Thus, liability will attach only if the *employer* failed to take the necessary precautions to control the risks associated with the activity." *Kinsey*, 139 N.C. App. at 375, 533 S.E.2d at 492 (citing *Woodson v. Rowland*, 329 N.C. 330, 352, 407 S.E.2d 222, 235 (1991)) (emphasis original). Any negligence on the part of defendant Cooper Steel, with respect to safety precautions, cannot be imputed to defendant Gray, the general contractor and employer. *Id.*

The evidence establishes that defendant Gray: (1) took the necessary precautions to control the attendant risks, and (2) was not present on the day of the accident, and (3) was not aware that defendant Cooper Steel had dropped the safety lines, and (4) did not proximately cause the injury to plaintiffs' decedent. The trial court's order granting a directed verdict in favor of defendant Gray should be affirmed.

### III. Summary

Since plaintiffs fail to establish a *Woodson* claim as to either defendant, I would hold that the trial court properly granted a directed verdict in favor of both defendants Cooper Steel and Gray.